Filed 3/9/22  SoCal Diesel v. Extrasensory Software CA2/1
Opinion following rehearing

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| SOCAL DIESEL, INC.,<br><br>     Plaintiff and Appellant,<br><br>     v.<br><br>EXTRASENSORY SOFTWARE, INC., et al.,<br><br>     Defendants and Respondents. | B290062, B293020<br><br>(Los Angeles County Super. Ct. No. BC597857)<br><br>PUBLIC—REDACTED VERSION OF OPINION<br><br>Redacts material from sealed record.[*]  (Civ. Code, § 3426.5; Cal. Rules of Court, rules 8.45, 8.46(f)(1) & (f)(2).) |

---

[*] This case involves material from a sealed record.  In accordance with Civil Code section 3426.5 and California Rules of Court, rules 8.45, 8.46(f)(1) and (f)(2), we have prepared both public (redacted) and sealed (unredacted) versions of this opinion.  We hereby order the unredacted version of this opinion sealed.

APPEAL from orders of the Superior Court of Los Angeles County, David Sotelo, Judge. Affirmed in part and reversed in part and remanded with directions.

Hacker Law Group, Jeffrey A. Hacker and Kristen E. Green for Plaintiff and Appellant.

Karish & Bjorgum, A. Eric Bjorgum and Marc Karish for Defendants and Respondents.

_____

SoCal Diesel, a manufacturer of devices that communicate with computers on truck engines, sued Extrasensory Software, a competitor, and Ira and Robyn Emus, its principals, for trade secret misappropriation, alleging defendants stole an algorithm used in SoCal's products. After presentation of the plaintiff's evidence, the court granted nonsuit as to Robyn, finding no evidence supported the allegation that she misappropriated any trade secret. After a jury verdict in favor of SoCal, the trial court granted Extrasensory's and Ira's motion for new trial, finding no evidence suggested the algorithm in their product was (1) similar to SoCal's algorithm or (2) wrongfully acquired.

We conclude the court properly granted a new trial because a reasonable fact finder could conclude from the evidence both that defendants' algorithm was not substantially similar to SoCal's and that it was reverse engineered by proper means. We further conclude nonsuit was improperly granted as to Robyn, whom evidence suggested oversaw Extrasensory's operations and knew that Ira had reverse engineered SoCal's algorithm, *possibly* by improper means. Accordingly, we affirm the court's order granting a new trial, reverse the order granting nonsuit, and remand the matter with directions to vacate nonsuit and order a new trial.

2

# BACKGROUND

## A.    EFILive and Ira and Robyn Emus

### 1.    Engine Control Module

A modern truck engine is controlled by a computer, called an Engine Control Module (Control Module), which receives signals from sensors throughout the vehicle, interprets them, and uses the results to communicate with actuators that adjust such factors as ignition timing, air-fuel ratios, and idle speed. The Control Module thus "tunes" the engine, while it is running, to meet desired performance and emissions goals. Embedded software in modern Control Modules is complex and sophisticated, able to monitor and regulate hundreds of parameters to optimize performance.

The group of calibrations—for example, water temperature, air pressure, or engine speed—necessary to achieve a particular performance profile is called a "tune."

A Control Module can be accessed by way of an "Onboard Diagnostics" (OBD2) port usually found under the driver's-side dashboard. A mechanic can attach a data cable between the OBD2 port and a scanning device, and from that device to a personal computer, to receive information from and convey commands to the Control Module.

Data streams to and from the Control Module may also be intercepted by a "can analyzer," which gathers the data in binary (1's and 0's) or hexadecimal form.

The performance and emissions goals established by a truck manufacturer are achieved by the "stock" tune, which the manufacturer pre-programs into the Control Module before it leaves the factory. Because an engine must meet various

environmental, fuel-use, and longevity standards, the stock tune is relatively conservative.

But some modern Control Modules can be programmed by truck owners to carry more than simply the stock tune.

An owner who has modified an engine with nonstandard equipment—for example a turbo- or supercharger, or high performance spark plugs or fuel injection—or who wishes to operate the vehicle in nonstandard conditions—such as in racing, towing, or offroading—may want to select a tune different from the stock tune, then later revert to the stock tune for standard conditions.

**2.    EFILive**

Paul Blackmore started EFILive, Ltd. (EFI) in the late 1990's to develop and sell computer hardware and software that monitors and modifies the performance characteristics of engines for competition and racing. (EFI, a New Zealand company is not a party here.) As pertinent here, EFI developed two pieces of hardware and associated software.

a.    FlashScan

EFI's "FlashScan" is a scanning tool that attaches to a Control Module by a Controller Area Network (CAN) "can connection" through the OBD2 port and to a PC by USB cable. The FlashScan pulls calibrations from an engine's Control Module to a PC, which displays them in the form of graphs and charts. A technician can edit these reported calibrations on the PC and upload the resulting modified tune through the FlashScan to the Control Module. The FlashScan can thus be used in connection with a PC to switch between tunes while the vehicle is being tested on a Dynamometer in a workshop.

b.     AutoCal

EFI also manufactures the "AutoCal," a device smaller than but similar to a FlashScan, which allows a technician to transfer a custom tune to a vehicle owner. The technician creates the custom tune in the workshop with a FlashScan and PC as described above, downloads the tune from the PC to an AutoCal by USB cable, then sends the AutoCal to the owner, who then connects it to a vehicle through the OBD2 port and transfers the custom tune to the vehicle's Control Module. Each AutoCal can be linked with only one FlashScan device and one Control Module.

c.     EFI Software

The FlashScan and AutoCal must be configured and loaded with proprietary software from EFI, which must also be installed on a PC. The software can be obtained either from a CD sold with the devices or by download. At the beginning of both the configuration and installation an End User License Agreement (EULA) will be displayed and must be affirmatively accepted. Only after the devices have thus been configured may they be loaded with custom tunes.

Once a now-configured and tune-loaded FlashScan or AutoCal is connected to a vehicle's Control Module through the OBD2 port, the tunes and EFI software are flashed to the Control Module.

d.     2013 CSP5 Software

A Control Module is normally able to house only one tune at a time. In 2013, EFI modified its software—now calling it "CSP5," for Cummins Switchable 5 position tuning—to load up to five different tunes onto a Control Module at one time, thus expanding the module's stock capabilities.

5

EFI licensed its CSP5 software to SoCal.

  e.  Security Identification Algorithm

However, to prevent accidental or unauthorized switching, the CSP5 software previously flashed to the Control Module will not accept a tune change without first completing a security protocol that authenticates any switch attempting to alter a tune. This protocol is effected by a CSP5 security identification algorithm, which we describe below.

**3. SoCal's "Switch"**

SoCal manufactures diesel racing parts, assembles racing engines, and distributes competition performance vehicle parts.

Under racing conditions it is impossible to navigate a computer menu and press keys to change between tunes. To make it possible to change tunes, SoCal manufactures the Cummins Engine CSP5 Switch (the Switch), a large physical device that can quickly select between tunes loaded on the Control Module of a Cummins diesel engine, such as is found in late model Dodge Ram trucks, while driving. The Switch attaches to a truck's dashboard and can implement any one of five preset tunes loaded onto the Control Module simply by turning a knob.

**4. Trade Secret: Security Identification Algorithm**

Before SoCal's Switch can access the tunes loaded onto a Control Module, it must initiate the CSP5 security identification algorithm also loaded onto the module, causing the module to recognize the Switch user as an authorized tuner. Without this authorization, the Control Module will be "locked," i.e., will reject any switching attempt.

That identification algorithm is part of the trade secret alleged here.

The identification algorithm "unlocks" the Control Module by **[REDACTED]**.

**[REDACTED]**

(At the time of trial, EFI had licensed only two CSP5 ID Codes, one to SoCal and one to Starlite Diesel, which is not a party here. Starlite's device operates similarly to SoCal's, but uses a mobile device rather than a Switch.)

In the first step of the algorithm, **[REDACTED].**

**[REDACTED]**

**[REDACTED]**

**[REDACTED]**

**[REDACTED].** If it corresponds, the Control Module recognizes the Switch as an authorized input device, and will accept its selection between tunes already programmed into the module.

SoCal identifies as its trade secret, licensed from EFI, the combination of the security algorithm, including the methods and the values (constants) it uses to compute **[REDACTED]** values, and SoCal's ID Code.

Defendants concede that they **[REDACTED]** SoCal's ID Code into each of their own switches.

## B.    The End User License Agreement

In 2005, Ira and Robyn Emus distributed EFI devices in the United States. Ira also worked for EFI as a tester of its devices. As part of the distributorship arrangement Ira signed a confidentiality agreement with EFI, and as part of his duties downloading and testing EFI software he had to agree to EFI's

7

EULA many times.  The EULA stated it was governed by New Zealand law.

EFI released its CSP5 software in 2013.

The relationship between the Emuses and EFI ended acrimoniously in March 2012.

EFI released its CSP5 software in 2013.

As discussed above, using any device with CSP5 software requires that the software first be installed on a PC.  After downloading CSP5 software from EFI or obtaining it on a CD sold by EFI, a user must accept an End User License Agreement (EULA) to install it.  This is done by selecting the "I Do Accept" option displayed at the beginning of installation.

The EULA prohibits use of CSP5 software, including any piece of it and any file it produces, or any connected device, for purposes of decompiling, accessing or otherwise reverse engineering the CSP5 algorithm.  The agreement provides:  "By connecting the EFILive software to any electronic control module, you confirm that you have read and agreed to the EFILive Terms and Conditions.  [¶]  If you do not agree with the EFILive Terms and Conditions, you must not use the EFILive software to connect to any electronic control module."  It provides that the user may not "modify, reverse engineer, decrypt or decompile the EFILive software or configuration files, or any part of them."

When an AutoCal is sold to a technician, the EULA will pop up on the technician's computer screen during configuration.  When the technician sends the tuned AutoCal to an end user, however, the EULA will not follow.

EFI assigned its rights to enforce the EULA to SoCal.

## C. Alleged Misappropriation of the Trade Secret

Ira and Robyn Emus are the sole officers, directors, shareholders, and employees of Extrasensory, which like SoCal manufactures tuning accessories for diesel engines.

In 2014, Ira, Robyn and Extrasensory began manufacturing and selling switches that defeated EFI's CSP5 security identification algorithm.

## D. Litigation

On October 14, 2015, SoCal sued Ira, Robyn, and Extrasensory for misappropriation of trade secrets (and other claims) under Civil Code section 3426, alleging they misappropriated the Switch security identification algorithm. After summary adjudication of other claims, the matter went to jury trial only on this claim.

At trial, Paul Blackmore, a software developer and the owner and CEO of EFI, testified that EFI developed its CSP5 software in 2012 and released it in 2013.

SoCal presented evidence that Robyn ran Extrasensory's operations, while Ira was its technical expert. Robyn planned with Ira to acquire and use SoCal's security identification algorithm. Specifically, Robyn testified that Extrasensory's switch needed EFI's software to operate, and that EFI's altering its software in 2013 caused the switch to cease working. She had written, "There is no way to screw with our switch functionality and not also screw with [SoCal's Switch]," and testified that she knew that Extrasensory's switch used SoCal's ID Code. Robyn testified, "They had changed the protocol, in my opinion, when they realized that we knew how to do it. So they changed it and then Ira figured it out again." Robyn knew about the EULA through her tenure as an EFI distributor up to 2012.

9

Ira testified that in 2013 he **[REDACTED]** and advertised on Craigslist for a "hacker" to help him **[REDACTED]** derive an algorithm that would overcome the EFI security identification algorithm lock. That effort proving fruitless, Ira placed another ad on an international job Web site for engineers and programmers, and over the next months interviewed several individuals until he found Pavel Simonov, a programmer based in Russia, to whom he sent the same information. Simonov agreed to "reverse engineer" the software for $5,000, and was ultimately successful. (The parties characterize Ira's efforts as "reverse engineering." We utilize this terminology for purposes of the appeal, without deciding whether it is accurate.)

Ira modified and incorporated Simonov's algorithm into switches he then manufactured and sold.

It was undisputed at trial that Ira's new algorithm caused his switch to **[REDACTED]**, just as SoCal's algorithm did (**[REDACTED]**), employed the same **[REDACTED]** SoCal's algorithm used, and **[REDACTED]**.

Ira admitted his efforts required decompiling EFI's intellectual property, and when asked whether his efforts violated the EULA, he responded, "no one has ever respected the end user license agreement." When asked a second time, Ira responded, "the EULA was never enforced. In all my years of working with EFILive, the EULA was never enforced." However, no evidence indicated that he downloaded or installed CSP5 software, nor that he agreed to the EULA after his relationship with EFI ended in 2012, almost a year before EFI released the CSP5 software.

After SoCal rested its case-in-chief, the trial court granted Robyn's motion for nonsuit, finding that no evidence suggested

she participated in or had reason to know about any misappropriation of SoCal's algorithm. Because she had no understanding of computer programming, she could not know that the algorithm was misappropriated as opposed to reverse engineered. The court found it "inherently improbable that [Robyn] committed any act directly or indirectly[,] implied or tacit[,] that would subject her to personal liability . . . ." The court further found that SoCal's maintenance of the action against Robyn was in bad faith, and granted her motion for fees and costs, awarding $198,485.24.

The court denied Ira's and Extrasensory's motion for nonsuit.

Ira testified he has never known the content of SoCal's algorithm, even during trial. He merely **[REDACTED]**. He testified that Simonov did not copy SoCal's algorithm.

Defendants presented evidence that Josh Chavez, a programmer from Arizona, independently reverse engineered the EFI software lock using an AutoCal, without using SoCal's algorithm, as did Dan Smith, an electrical engineer. Smith and Josh Chavez both testified that defendants' algorithm was not similar to SoCal's, but instead functioned like the EFI algorithm operating on a Control Module, in that it could **[REDACTED]**. (Smith testified that he reverse engineered SoCal's algorithm using only a pre-tuned AutoCal (and Control Module **[REDACTED]**), and never encountered the EULA.)

Smith testified that Extrasensory's and SoCal's algorithms were "not the same" because they performed different steps. Smith acknowledged that both algorithms would produce the same result if given the same input, but testified that SoCal's algorithm could accept only one input value, while Extrasensory's

11

could accept approximately 65,000 values. Although it was undisputed that Extrasensory's algorithm (1) used SoCal's user ID Code (even though it did not have to); (2) **[REDACTED]**, Smith nevertheless testified that the algorithms were different because "the whole idea of the algorithm being the same would be for the same inputs they should result in the same outputs, and for some input the outputs would be different comparing the EFILive description versus the [Extrasensory] tuning C code." In sum, whereas SoCal's algorithm would work with only one user ID Code, Extrasensory's algorithm would work with any user ID Code, using math steps not found in the other algorithm.

Chavez testified that the SoCal and Extrasensory algorithms "are a different algorithm because they perform different operations that are not described in the trade secret or are not used in the SoCal Diesel switch code."

SoCal attempted to rely upon the EULA throughout trial but the trial court repeatedly sustained defendants' objections to its consideration because, the court found, the EULA could not "trump" or "govern over" California law. The court ultimately issued jury instructions to that effect.

On March 23, 2018, the jury returned a special verdict finding that Ira and Extrasensory misappropriated SoCal's trade secret, and awarded disgorgement of profits in the amount of $482,000.

Ira and Extrasensory moved for judgment notwithstanding the verdict (JNOV) and a new trial.

On June 14, 2018, the court denied defendants' motion for JNOV but granted the motion for new trial. It found "the jury was wrong—'clearly' so, in finding that plaintiff's algorithm was the same as defendants' and that plaintiff misappropriated the

trade secret." The court found that no substantial evidence suggested SoCal's switching algorithm "was the same as" defendants' algorithm. **[REDACTED]**. As a result, "[defendants'] switching algorithm would function with different [manufacturer IDs], something that [plaintiff's] switching algorithm would be unable to do. Put another way, plaintiff's switching algorithm is a **[REDACTED]**. . . . The switching algorithms were not simply different sets of instructions that would produce the same outputs for a given input. The algorithms were different in substance."

The court further found that "[o]ther than innuendo, no substantial evidence was presented that [defendants] 'misappropriated' or wrongfully obtained plaintiff's designated Trade Secret (the combined algorithm and manufacturer I.D.)." (Internal quotations omitted.) Instead, the evidence showed that Ira reverse engineered a "separate and distinct" algorithm, which is permissible. "Had Ira Emus simply misappropriated the relevant information given to him under the confidentiality agreement, there would have been no need to even attempt reverse engineering and, more importantly, the switching algorithms would have simply been the same."

SoCal appealed separately from the orders granting Robyn nonsuit and granting Ira's and Extrasensory's motion for new trial. We consolidated the appeals.

We issued an opinion in this matter on May 3, 2021, but subsequently granted rehearing, vacated the opinion, and sought supplemental briefing. We asked four questions, two of which are pertinent for our discussion:

1. Where does the record reflect that after terminating his relationship with EFI in 2012, Ira Emus or his agent

13

downloaded, used or transferred CSP5 software (except for purposes of this litigation) that was subject specifically to the 2007 EULA?

2.      Where does the record reflect that Ira Emus knew about the 2007 EULA after 2012?

The parties' answers and our own reexamination of the record indicate that nothing in the record shows Ira downloaded, used, or transferred CSP5 software subject specifically to the 2007 EULA. The testimony showed that he transferred unidentified computer files to Pavel Simonov that may have been subject to some end user license agreement, but did not show what these files were or that they were subject specifically to the 2007 EULA. It is not clear what fragments of code Simonov used.

## DISCUSSION

### A.    New Trial

SoCal contends the trial court abused its discretion in granting defendants' motion for new trial. We disagree.

#### 1.    Applicable Law

A new trial may be granted only on grounds specified in Code of Civil Procedure section 657, one of them being "Insufficiency of the evidence to justify the verdict."

"Trade secret" means "information, including a formula, pattern, compilation, program, device, method, technique, or process, that: [¶] (1) Derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and [¶] (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." (Civ. Code, § 3426.1, subd. (d).)

14

Algorithms and computer code can be trade secrets. (*Altavion, Inc. v. Konica Minolta Sys. Lab., Inc.* (2014) 226 Cal.App.4th 26, 59.) Software in a product remains a trade secret when it is not necessarily revealed during the product's use. (*Ibid.*)

"Misappropriation" of a trade secret means "Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired *by improper means*." (Civ. Code, § 3426.1, subd. (b), italics added.)

"Improper Means" includes theft, "inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." (Civ. Code, § 3426.1, subd. (a).)

However, "[r]everse engineering or independent derivation alone shall not be considered improper means." (Civ. Code, § 3426.1, subd. (a).)

We review an order granting a new trial for abuse of discretion. (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 860.) "[O]n appeal from an order granting a new trial upon the ground of the insufficiency of the evidence to justify the verdict . . . , such order shall be reversed as to such ground only if there is no substantial basis in the record" supporting it. (Code Civ. Proc., § 657.)

## 2. Application

Here, the trial court made two findings: that SoCal failed to establish either that defendants (1) copied SoCal's algorithm or that they (2) misappropriated as opposed to permissibly reverse engineered it. (SoCal argues the court made only the first finding, not the second. We discuss that argument below.) If supported by the evidence, these findings would undermine the essential assertions forming the basis of the jury's verdict—that

15

defendants obtained SoCal's trade secret by improper means—and therefore ostensibly provide a sufficient basis for ordering a new trial.  We conclude that the record supports both findings.

### 3.    Dissimilarity Between SoCal's and Defendants' Algorithms

The first question is whether evidence supported the trial court's finding that Extrasensory's algorithm was different from SoCal's.  In our prior opinion we held that the evidence supporting the difference, the testimony of Smith and Chavez, lacked sufficient foundation.  Upon further reflection, however, we conclude the court was entitled to credit the testimony not only of Smith and Chavez but also Ira Emus, all of whom opined that the algorithms were different.

Smith and Josh Chavez both testified that defendants' algorithm functioned like the EFI algorithm operating on a Control Module, but was not the same as that algorithm because it could produce an acceptable key value from any user ID input. They described the algorithms as functionally identical, but only when SoCal's user ID Code was used:  **[REDACTED]**

Both experts distinguished the manner in which Extrasensory's and SoCal's algorithms **[REDACTED].**  Although it was undisputed (1) that Extrasensory's algorithm would not work without **[REDACTED]**; (2) that the initial values, end value, and all constants were the same; and (3) that both algorithms "functioned substantially the same way and accomplished substantially the same result" (*Sinclair v. Aquarius Electronics, Inc.* (1974) 42 Cal.App.3d 216, 222), the specific operations employed to reach interim values were different.

Smith and Chavez concluded that Extrasensory's algorithm constituted an independent reverse engineering of a prior

16

solution to find a new solution reached by different means. Because in reviewing an order granting a new trial we must defer to the trial court's view of the evidence, we now conclude we must accept its view of Smith's and Chavez' testimony. Even though the evidence was susceptible to opposing interpretations, a reasonable finder of fact sitting much closer to the evidence than we, watching and hearing as the evidence unfolds, could have credited Smith and Chavez.

We reiterate from our prior opinion that parties "cannot escape responsibility by showing that they have improved upon or modified plaintiff's process. Even though they may have modified or improved the plaintiff's process they are still wrongfully using its property." (*By-Buk Co. v. Printed Cellophane Tape Co.* (1958) 163 Cal.App.2d 157, 169; see also *American Can Co. v. Mansukhani* (7th Cir. 1984) 742 F.2d 314, 328-329 ["a party may not use another's trade secret, even with independent improvements or modifications, so long as the product or process is substantially derived from the trade secret"].) "One who seeks to pirate an invention, like one who seeks to pirate a copyrighted book or play, may be expected to introduce minor variations to conceal and shelter the piracy. Outright and forthright duplication is a dull and very rare type of infringement. To prohibit no other would place the inventor at the mercy of verbalism and would be subordinating substance to form." (*Graver Tank & Mfg. Co. v. Linde Air Products Co.* (1950) 339 U.S. 605, 607.) "If the law were not flexible enough to reach such modifications, trade secret protection would be quite hollow." (*American Can Co.*, at p. 329.)

However, Smith, Chavez, and Ira Emus all testified that Extrasensory's algorithm constituted the independent

17

engineering of a solution to EFI's security identification algorithm derived from raw data openly conveyed from the Control Module to a scanning tool, not simply a copy of EFI's or SoCal's process. The court was entitled to credit this testimony and order a new trial based on it.

**4.     Appropriation by Inappropriate Means, i.e., Violation of the EULA**

We next consider whether evidence supported the court's finding that Ira did not appropriate the trade secret by improper means.

**5.     Procedure**

SoCal preliminarily argues that the trial court granted a new trial only on the ground of insufficient evidence, and reasoned the evidence was insufficient only because SoCal and Extrasensory algorithms were different. Under the rule of *Mercer v. Perez* (1968) 68 Cal.2d 104 (*Mercer*), SoCal argues, we may review only whether the algorithms were different, not whether the evidence was insufficient for any other reason.

Given our holding on that question, *ante*, we need not examine the improper means issue. However, we disagree with SoCal's characterization of the court's order, and in any event wish to provide the trial court with some guidance on the issue should there be another trial.

A trial court must specify the reasons why the evidence supports a moving party's grounds for seeking a new trial. (See *Scala v. Jerry Witt & Sons, Inc.* (1970) 3 Cal.3d 359, 363 (*Scala*).) A statement of reasons suffices where the court "furnishes a concise but clear statement of the reasons why" one or more "grounds" in Code of Civil Procedure section 657 applies. (*Mercer*, *supra*, 68 Cal.2d at p. 115.)  "[T]he judge must briefly

18

recite the respects in which he [or she] finds the evidence to be legally inadequate" (*id*. at p. 116) and "identify the deficiencies" in " 'the proof.' " (*Scala*, at p. 367.) A brief summation regarding the key evidence suffices. (*Id*. at p. 370.) The key question is whether the court's explanation is adequate to facilitate " 'meaningful appellate review.' " (*Oakland Raiders v. National Football League* (2007) 41 Cal.4th 624, 637.)

Here, the court found first that "the jury was wrong— 'clearly' so, in finding that plaintiff's algorithm was the same as defendants' and that [defendants] misappropriated the trade secret."

However, the court went on to find that "[o]ther than innuendo, no substantial evidence was presented that [defendants] 'misappropriated' or wrongfully obtained plaintiff's designated Trade Secret (the combined algorithm and manufacturer I.D.)." Instead, the evidence showed that Ira reverse engineered a "separate and distinct" algorithm, which is permissible. "Had Ira Emus simply misappropriated the relevant information given to him under the confidentiality agreement, there would have been no need to even attempt reverse engineering and, more importantly, the switching algorithms would have simply been the same."

Both findings discussed the difference between Extrasensory's and SoCal's algorithms, but the second used the word "misappropriated" twice (putting it in quotes the first time) and "wrongfully" once, from which we conclude the court found Ira's reverse engineering of the algorithm constituted a proper means of obtaining it.

We conclude the record supported the court's finding that no evidence indicated Ira reverse engineered SoCal's algorithm

19

by improper means.  But it is not clear that the court fully considered EFI's EULA in making that finding.

It was undisputed that installing CSP5 software on any computer, which was necessary to configure every AutoCal and install CSP5 software onto a Control Module, was subject to the EULA, which prohibited decompiling or reverse engineering the software.

Civil Code section 3426.1 states that "Reverse engineering or independent derivation *alone* shall not be considered improper means."  (Civ. Code, § 3426.1, subd. (a), italics added.)  Use of the word "alone" indicates that reverse engineering attended by some delict is improper.  If Ira Emus agreed to the EULA—which specifically prohibited reverse engineering—with the intention of breaching it, that would constitute an improper means of obtaining EFI's trade secret.  (See *Lazar v. Superior Court* (1996) 12 Cal.4th 631, 638 [entering a contract with the intention of breaching it constitutes fraud].)

" 'The basic logic of the common law of trade secrets recognizes that private parties invest extensive sums of money in certain information that loses its value when published to the world at large.' [Citation.]  Based on this logic, trade secret law creates a property right 'defined by the extent to which the owner of the secret protects his interest from disclosure to others.' " (*DVD Copy Control Assn., Inc. v. Bunner* (2003) 31 Cal.4th 864, 880.)  "By sanctioning the acquisition, use, and disclosure of another's valuable, proprietary information by improper means, trade secret law" "recognizes that ' "good faith and honest, fair dealing, is the very life and spirit of the commercial world." ' " (*Id*. at p. 881.)

Fraudulent violation of EFI's EULA, which expressly prohibited the very measures employed here and was designed to avoid the very result obtained, defeated EFI's (and by assignment SoCal's) efforts to protect its interest, and cannot be considered good faith and honest, fair dealing. We conclude that a deliberate violation of the EULA would constitute an improper means by which to reverse engineer SoCal's algorithm. (See *Viken Detection Corp. v. Videray Techs., Inc.* (D.Mass. Jan. 7, 2020, Civil A. No. 19-10614-NMG) 2020 U.S.Dist. Lexis 2138, at pp. *10-11.)

Defendants argue the EULA is irrelevant because reverse engineering can never be an improper means of obtaining a trade secret. Untrue. As stated above, Civil Code section 3426.1, subdivision (a) provides that "Reverse engineering or independent derivation *alone* shall not be considered improper means." (Italics added.) Reverse engineering accomplished by fraud is not reverse engineering alone. Entering into a EULA with the intention of violating its terms is fraud.

Defendants argue that reverse engineering is proper where a rightful user is "examining or testing a product to determine whether it works." Perhaps so, but nothing suggests that was defendants' purpose here. On the contrary, defendants admittedly reversed engineered SoCal's algorithm in order to create their own competing product.

However, we have been directed to no evidence, and our own reexamination revealed none, indicating that Ira violated the EULA, deliberately or otherwise.

We asked the parties for supplemental briefing about what evidence suggests that Ira, after terminating his relationship with EFI in 2012, or his agent, used or transferred CSP5

21

software (except for purposes of this litigation) that was subject specifically to the 2007 EULA.

SoCal gave several nonresponsive and/or misrepresentational answers. First, it argued that Ira admitted in his testimony that he continued to download, use and transfer CSP5 software files after 2012. The testimony cited for this proposition pertained to Ira's email conversations with Simonov and the transfers by Ira of unidentifiable files and code fragments and by Simonov of computer code representing the fruits of his reverse engineering efforts. However, nothing in these exchanges indicated that the two exchanged anything that was subject to the EULA.

SoCal argued that software Ira used could not be "downloaded" without agreeing to the EULA, but the testimony of EFI's CEO indicated that EFI's software *could* be downloaded without agreeing to the EULA, it simply could not be *installed*. It is not clear whether this is a substantive difference, but that uncertainty just means that even if the files exchanged between Ira and Simonov were described in the EULA, it is not clear they were obtained after installing (as opposed to simply downloading) EFI software.

(Smith testified that he reverse engineered SoCal's algorithm using only a pre-tuned AutoCal and CAN analyzer, and never encountered the EULA.)

SoCal represented that Ira testified that in 2013 he sent Simonov "a CSP5 file" after converting it with EFILive software, but the testimony was actually about a *CSP* file, CSP5's precursor.

SoCal argued that Ira admitted using the new EFI CSP5 software in his testing and troubleshooting of Simonov's algorithm, but again, the testimony was about only CSP software (and sometimes "EFI software"), not specifically about CSP5.

22

In any event, that Ira downloaded, used or transferred CSP5 software "files" does not mean he knew about the EULA, which popped up on a computer screen only when a user installed a CSP5 package. We have found nothing in the record indicating Ira ever installed one, and nothing indicating he needed to have done so in order to transact with Simonov.

If there is a second trial, we think the trial court would be well advised to ascertain exactly which EULA—the one from 2005 or from 2013—Ira encountered after 2013 and under what circumstances, and whether the law governing that EULA would enforce its prohibition against reverse engineering the software within the pertinent timeframe.

### 6.     Other Grounds for New Trial

Defendants argue that SoCal's counsel characterized them as "cheaters" during opening argument, which inflamed the jury's passions, and in closing argument asserted that defendants violated the EULA, which misrepresented the law. Defendants argue a new trial is warranted because of counsel's misconduct. We disagree. Characterizing defendants as cheaters was no more inflammatory than SoCal's theory that defendants deliberately schemed to misappropriate its trade secret. An attorney " 'may vigorously argue his case and is not limited to "Chesterfieldian politeness." ' " (*People v. Fields* (1983) 35 Cal.3d 329, 363.) And as discussed above, counsel's characterization of the law was correct.

Defendants argue a new trial is warranted on the issue of damages because Chavez's independent reverse engineering of the SoCal algorithm vitiated some of SoCal's damages by reducing the period during which the algorithm was entitled to protection. We are in no position to reweigh the evidence on damages, and thus cannot from our vantage point affirm a new

trial based on them.  In any event, these matters may be revisited at any second trial.

## B.      Grounds for Nonsuit

SoCal contends nonsuit as to Robyn was improper.  We agree.

A motion for nonsuit tests the legal sufficiency of a plaintiff's evidence, operating, in effect, as a demurrer to the evidence.  The motion lies when the plaintiff's evidence, taken as true and construed most strongly in favor of the plaintiff, entitles the plaintiff to no relief under any theory.  (*Castaneda v. Olsher* (2007) 41 Cal.4th 1205, 1214-1215.)  In a proper case the court has the duty to forestall the cost and delay of a meritless lawsuit by granting nonsuit.  (*O'Keefe v. South End Rowing Club* (1966) 64 Cal.2d 729, 746.)

A nonsuit motion may be made "[o]nly after, and not before, the plaintiff has completed his or her opening statement, or after the presentation of his or her evidence in a trial by jury."  (Code Civ. Proc., § 581c, subd. (a).)  The motion may be granted as to "some but not all of the issues involved in the action."  (Code Civ. Proc., § 581c, subd. (b).)

Because a nonsuit deprives the plaintiff of the right to have a claim determined by a jury, California courts take a restrictive view of the circumstances under which it may be granted. (*Carson v. Facilities Development Co.* (1984) 36 Cal.3d 830, 838.)

In reviewing a judgment of nonsuit, we are "guided by the same rule requiring evaluation of the evidence in the light most favorable to the plaintiff.  'The judgment of the trial court cannot be sustained unless interpreting the [proposed] evidence most favorably to plaintiff's case and most strongly against the defendant and resolving all presumptions, inferences and doubts

in favor of the plaintiff a judgment for the defendant is required as a matter of law.' " (*Carson v. Facilities Development Co.*, *supra*, 36 Cal.3d at p. 839.)

An officer or director of a corporation may not use her position as an agent of the corporation to escape liability for "personally direct[ing] or participat[ing] in . . . tortious conduct" (*Frances T. v. Village Green Owners Assn.* (1986) 42 Cal.3d 490, 504), but is liable to a third party "[w]hen [her] acts are wrongful in their nature" (Civ. Code, § 2343). Thus, "a corporate officer or director may be liable for an intentional tort" committed by the corporation at the officer or director's behest. (*PMC, Inc. v. Kadisha* (2000) 78 Cal.App.4th 1368, 1372.)

Here, Robyn testified that defendants' switch needed EFI's code, and consequently SoCal's algorithm, to operate, and that EFI's altering its software in 2013 caused their prototype switch to cease working. She testified, "They had changed the protocol, in my opinion, when they realized that we knew how to do it. So they changed it and then Ira figured it out again." Evidence thus suggested that Robyn: planned with Ira to acquire and use SoCal's trade secret; knew about the EULA through her tenure as an EFI distributorship; knew that it at least facially prohibited reverse engineering of EFI's software; and knew defendants' switch could not be created without such reverse engineering. A reasonable jury could thus find that Robyn controlled Extrasensory's actions and directly participated in any misappropriation of SoCal's trade secret, and thus can be held personally liable.

The court found, and defendants argue, that Robyn was not a computer programmer, and did not know what decompiling hardwired code entailed.

25

The point is irrelevant because if Robyn knew that the EULA prohibited decompiling EFI's hardwired code, no matter how it was accomplished, she need not be a programmer to facilitate Ira's breach of the EULA.

Defendants argue that Robyn, at worst, believed the trade secret was acquired through reverse engineering, but "reverse engineering is expressly excluded from the definition of improper means." This argument has been discussed and rejected above.

## DISPOSITION

The order granting nonsuit is reversed. The order granting a new trial is affirmed, and the matter is remanded for further proceedings consistent with this opinion. The parties are to bear their own costs on appeal.

NOT TO BE PUBLISHED

CHANEY, J.

We concur:

BENDIX, Acting P. J.

CRANDALL, J.[†]

---

[†] Judge of the San Luis Obispo County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.